UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | CR-05-53-B-W |
| | ) | |
| | ) | |
| WINSLOW NEWBERT | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION TO WITHDRAW GUILTY PLEA**

On June 7, 2006, Winslow Newbert pleaded guilty to possession with the intent to distribute cocaine, a violation of 21 U.S.C. § 841(a)(1), and on July 31, 2006, he filed a motion to withdraw his plea. Even though the formalities of the Rule 11 hearing were fully satisfied, the Defendant was competent to enter a plea, and he entered his guilty plea in a knowing, voluntary and intelligent fashion, the Court concludes that the Defendant has presented evidence that he may be actually innocent of the crime, that he had a plausible reason for pleading guilty, that the timing of the motion – within two months of the guilty plea and before sentencing – does not disfavor permitting withdrawal of the plea, and that there is no demonstrable prejudice to the Government by granting the motion. On balance, although this is a exceptionally close case, the Court grants the Defendant's motion to withdraw.

**I.  STATEMENT OF FACTS**

On July 12, 2005, the Grand Jury issued an Indictment, charging the Defendant Winslow Newbert with one count of possession with the intent to distribute cocaine. *Indictment* (Docket # 1). Temporarily detained after his arrest on August 4, 2005, Mr. Newbert was released on bail on August 10, 2005. *Order of Temp. Detention* (Docket # 9); *Order Setting Conditions of*

*Release* (Docket # 15).  Trial was repeatedly scheduled and continued.  On February 3, 2006, a change of plea hearing was scheduled for February 17, 2006, but was continued upon Mr. Newbert's motion, asserting a need for additional information.  *Unopposed Mot. to Continue* (Docket # 40); *Order* (Docket # 41).  On February 22, 2006, the Court reset the case for trial for March 7, 2006, but on February 28, 2006, Mr. Newbert's counsel moved to withdraw as counsel, stating that their communications had broken down.  *Mot. to Withdraw* (Docket # 46).  After a hearing, the Court granted the motion on March 2, 2006, appointed new counsel, and on March 6, 2006, granted another motion to continue, this time from Mr. Newbert's new counsel. *Order* (Docket # 49); *Mot. to Continue* (Docket # 50); *Order* (Docket # 51).  On March 6, 2006, the case was reset for trial for April 4, 2006 but was again continued on March 28, 2006, because new counsel needed time to gain familiarity with the case.  *Mot. to Continue* (Docket # 55); *Order* (Docket # 56).

On April 19, 2006, the Government moved to revoke Mr. Newbert's bail based on a variety of reasons, including the Defendant's failure to maintain contact with Pretrial Services.  *Mot. to Revoke Order Setting Conditions of Release* (Docket # 64).  After a hearing, the Court granted the Motion on April 25, 2006, and Mr. Newbert was detained pending trial.  *Order of Revocation and Detention* (Docket # 80).  The matter was reset for trial and jury selection for June 6, 2006.  On June 6, 2006, Defendant notified the Court that he wished to enter a plea of guilty and the Court held a Rule 11 hearing on June 7, 2006.  *Change of Plea Hr'g* (Docket # 112); *Rule 11 Tr.* (Docket # 116).  The Court accepted the guilty plea and ordered the preparation of a Presentence Report (PSR).  *Id.*

The parties entered into a plea agreement which, among other things, waived Mr. Newbert's right of appeal if the Court imposed a sentence based on offense level 10 or below.[1] On July 21, 2006, the Probation Office issued the PSR, which revealed that Mr. Newbert had been convicted of two burglaries in 1987 when he was 19 years old. Because there is no time limit to prior convictions for purposes of Career Offender status,[2] instead of the anticipated guideline range of between 15 and 21 months, Mr. Newbert faced a guideline range dramatically escalated to between 210 and 240 months, capped by the statutory maximum.

On July 31, 2006, Mr. Newbert filed the motion to withdraw his guilty plea. *Def.'s Mot. to Withdraw Plea of Guilty* (Docket # 115) (*Def.'s Mot.*). The motion states that Mr. Newbert is innocent of the crime. *Id.* at 1. It states that Mr. Newbert believed that, by pleading guilty, he was protecting his wife, Gail Newbert. *Id.* The motion goes on, however, to say that, since Mr. Newbert's arrest, his marriage has crumbled and he is no longer motivated to protect her. *Id.* at 1-2. In addition, he asserts that he recently learned through his daughter that James Michael Smith,[3] a friend and next door neighbor, had placed a pill bottle in his basement just before the police searched the residence on February 28, 2002. *Id.*

The Court held an evidentiary hearing on the motion to withdraw plea on October 18, 2006, and on November 7, 2006. *See Hr'g on Mot. to Withdraw Plea Tr.* (Docket # 144 & 145). On October 18, 2006, the witnesses were: Miranda Newbert, the Defendant's fifteen-year-old daughter; Gail Newbert, the Defendant's wife; Mr. Newbert himself; and Supervisory Deputy

---

[1] The appeal provision in the agreement suggests what the parties thought the likely offense level would be. At offense level 10, depending on criminal history, the United States Sentencing Guidelines establishes a sentencing range from 6 to 30 months. Under the PSR, but for the Career Offender provisions, Mr. Newbert would have been a criminal history category IV and, at offense level 10, subject to a sentencing range of 15 to 21 months.

[2] Under U.S.S.G. § 4B1.1(a), a defendant is a career offender if "(1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense."

[3] Defendant's motion refers to "David Smith" while the corresponding affidavit refers to "Mike Smith." These and other similar references have been clarified as referring to James Michael Smith.

United States Marshal Randy Ossinger.   On November 7, 2006, the witnesses were James Michael Smith, Desiree Newbert, another one of the Defendant's daughters, Andrew Desrochers, Desiree's boyfriend, and Fred Luce, a law enforcement officer with the Drug Enforcement Administration (DEA).

## II. DISCUSSION

Rule 11(d) addresses the withdrawal of a guilty plea after the plea has been accepted but before sentencing.  Fed. R. Crim. P. 11(d)(2).  The Rule provides that at this stage a defendant may withdraw a plea of guilty if "the defendant can show a fair and just reason for requesting the withdrawal."  Fed. R. Crim. P. 11(d)(2)(B); *United States v. Pizarro-Berrios*, 448 F.3d 1, 4 (1st Cir. 2006).   A defendant has no absolute right to withdraw a plea, *United States v. Gonzalez*, 202 F.3d 20, 23 (1st Cir. 2000), and the burden of persuasion rests upon the defendant.  *United States v. Castro-Gomez*, 233 F.3d 684, 687 (1st Cir. 2000); *United States v. Marrero-Rivera*, 124 F.3d 342, 347 (1st Cir. 1997).  Whether to grant a motion for withdrawal of a guilty plea rests in the sound discretion of the trial court and is reviewed for an abuse of discretion.  *Castro-Gomez*, 233 F.3d at 686; *United States v. Ribas-Dominicci*, 50 F.3d 76, 78 (1st Cir. 1995).

In determining whether to allow withdrawal, the First Circuit has written that "the case law suggests that among the relevant factors are whether the plea was voluntary, intelligent, and knowing and complied with Rule 11; the force of the reasons offered by the defendant; whether there is a serious claim of actual innocence; the timing of the motion; and any countervailing prejudice to the government if the defendant is allowed to withdraw his plea."  *United States v. Padilla-Galarza*, 351 F.3d 594, 597 (1st Cir. 2003); *Gonzalez*, 202 F.3d at 24; *United States v. Richardson*, 225 F.3d 46, 51 (1st Cir. 2000). In addition, the court may take into account "whether a plea agreement had been reached."  *Gonzalez*, 202 F.3d at 24.  *Padilla-Galarza* notes

that the "customary standards of review apply but a good deal of discretion is accorded to the district court." 351 F.3d at 597.

### A. Voluntary, Intelligent and Knowing

#### 1. Rule 11 Formalities

Whether the plea was voluntary, intelligent, and knowing is the most significant of the five factors. *Richardson*, 225 F.3d at 51; *United States v. Cotal-Crespo*, 47 F.3d 1, 3 (1st Cir. 1995). To make this assessment, courts review the Rule 11 hearing to determine whether the "court adequately observed the formalities imposed by Rule 11, which are intended to assure that the defendant understands the charge and the consequences of the plea." *Padilla-Galarza*, 351 F.3d at 597. Rule 11(b) sets forth the district court's obligation to advise and question the defendant. Fed. R. Crim. P. 11(b).

Here, Mr. Newbert makes no claim that the formalities of Rule 11 were violated. Further, the Court has carefully reviewed the transcript of the June 7, 2006 Rule 11 hearing and concludes that the hearing satisfied each of the express requirements of the Rule.

#### 2. Drug Withdrawal and Transfer to Piscataquis County Jail

Although Mr. Newbert is not claiming that the Court failed to observe the formalities of Rule 11, he nevertheless maintains that his guilty plea was neither voluntary nor knowing, because, at the time of the Rule 11 hearing, he was going through withdrawal symptoms from an addiction to Methadone and Oxycodone. When he testified on October 18, 2006, Mr. Newbert explained that he was an inordinately heavy user of these drugs, taking fourteen 10-milligram tablets of Methadone a day: seven at noon and an additional seven in the evening. *Hr'g on Mot. to Withdraw Plea Tr.* 54:3-7. He was also prescribed a heavy dose of Oxycodone. *Id.* at 54:7-9. According to Mr. Newbert, after he was incarcerated on April 21, 2006, the Penobscot County

Jail refused to allow him to take either Methadone or Oxycodone and allowed him to take only one 5-milligram Vicodin, and one Klonopin.[4]   *Id.* at 54:10-12.   Mr. Newbert said that as a consequence of his state of withdrawal while he was at the Penobscot County Jail, he fell down a flight of stairs and was taken to the hospital.   *Id.* at 55:8-12.   He further explained that, while going through withdrawal, he was "right out of it" and could not "remember doing stuff."   *Id.* at 55:8-12.

Mr. Newbert claimed that he was still going through withdrawal symptoms on June 7, 2006, when he entered his guilty plea.   He testified that when he arrived at the courthouse on June 7, he "wasn't feeling good at all."   *Id.* at 55:13-15.   He also testified that, based on a prior incarceration, he was aware that the Piscataquis County Jail would allow him to take the Methadone and Oxycodone.   Although he does not claim that the Government actually promised to transfer him to Piscataquis County if he pleaded guilty, he suggests that the possibility of a jail transfer was one of the factors that motivated his guilty plea.[5]   *Id.* at 55:13-22.   In sum, he argues

---

[4] At the Rule 11 hearing, Mr. Newbert revealed that he had been prescribed Glucophage, Klonopin and Vicodin for medical reasons.  He confirmed that the jail had provided him with these medicines and he had taken them in the appropriate doses and at the appropriate times the night before and day of the Rule 11 hearing.   *Rule 11 Tr.*at 2-4 (Docket # 116).
[5] Mr. Newbert does not contend that the Government knew of his need for Methadone and Oxycodone or used his vulnerability to extract a guilty plea.  Instead, he testified that he knew from prior experience that he would be allowed access to those drugs at the Piscataquis County Jail and this – along with the nearness of his family – motivated, and explains, his repeated requests to be transferred there after the guilty plea:

> Q.  And in the beginning of June, when you came to court, here, to change your plea, how were you feeling at that time?
> A.  I wasn't feeling good at all.  As a matter of fact, when I talked to you down there, I - - I asked you if I could be transported to Piscataquis, and I would plead guilty.  I did ask - - I asked everybody that before I pleaded guilty.  I said, if - - if they'll allow me to go to Piscataquis, I'll plead guilty.  That way I figured they would give me some medication there, and I'd be closer to my family so I could see my family.
> Q.  What made you think that you would be able to get more medication in Piscataquis?
> A.   Because when I was previous in - - previously incarcerated in Piscataquis, they let me have my medication, and I figured if I got to Piscataquis again, I'd get my medication or get something for medication better than the Vicodin 5-milligram, because I was still going through withdrawals from a lot of medication.

*Hr'g on Mot. to Withdraw Plea Tr.* 55:13-25; 56:1-5.

> Q.  Did you have any assurances that you - - did you believe that there were assurances from the government that you would receive medication?
> A.  Yes, I mean - -
> Q.  But - -

that his state of withdrawal, his need for drugs, and his belief that he would receive them at Piscataquis County collectively combine to cast doubt on his ability to understand the proceedings and the voluntariness of his guilty plea.

Turning first to the general implication of Mr. Newbert's contentions, the Court firmly rejects any suggestion that Mr. Newbert was not competent to enter a plea of guilty on June 7, 2006. At the beginning of the Rule 11 hearing, the Court closely questioned Mr. Newbert as to whether he had taken any prescriptive medication. *Rule 11 Tr.* at 2-5. Mr. Newbert responded by noting the names of the medications, their purposes, and the times he had taken them. *Id.* The Court directly asked Mr. Newbert whether he felt he understood what was happening and Mr. Newbert assured the Court that he did. *Id.* at 5. The Court made a specific finding that Mr. Newbert was competent to enter a plea. *Id.* The Court then explained to Mr. Newbert that the purpose of the hearing was for the Court to be assured that his plea was "knowing and voluntary, that you understand what you're doing, and that you're doing what you're doing of your own free will." *Id.* at 6. The Court then engaged in lengthy and detailed questioning in compliance with the Rule 11 requirements. Mr. Newbert responded to the questions appropriately and at no time signaled any lack of comprehension, untoward behavior, or other signs consistent with withdrawal symptoms. Moreover, throughout the Rule 11 hearing, the Court remained vigilant and continued to assess the Defendant's competency by observing his presentation, appearance, and responses. From the Court's own observations, he was not experiencing any apparent symptoms of drug withdrawal that interfered with his ability to understand the proceedings, to

---

A.   No, no, no, the government never said anything about assurance on - - they never said nothing about medication.

Q.   Did you believe that there were assurances from the government that after your plea of guilty you'd be transferred to the Piscataquis jail?

A.   Yes, I do. That was made clear. For me to plead guilty, I would - - I wanted to go to Piscataquis. I said that over and over and over.

*Id.* at 58:12-24.

make rational and informed judgments about the proceedings, and to do so voluntarily.  At the close of the hearing, the Court again found that Mr. Newbert was competent to enter a plea.  *Id.* at 21.  The extensive Rule 11 colloquy the Court conducted with counsel and with the Defendant was for the express purpose of assuring itself that the Defendant was competent to enter a plea and was doing so knowingly and voluntarily.  Mr. Newbert repeatedly assured the Court that he was and "[i]t is the policy of the law to hold litigants to their assurances."  *United States v. Parrilla-Tirado*, 22 F.3d 368, 373 (1st Cir. 1994).

Having had the opportunity to observe Mr. Newbert at the time of the Rule 11 hearing, bearing in mind its specific requirements, the Court was confident on June 7, 2006, and remains confident that Mr. Newbert was fully competent to enter his plea of guilty.  The Court rejects Mr. Newbert's argument on this point.

Mr. Newbert's next argument is that the guilty plea was not knowing and voluntary, because, even if he was competent to enter a plea, he was going through withdrawal symptoms and was willing to plead guilty simply to receive Methadone and Oxycodone in another facility.  Again, Mr. Newbert does not assert that the Government knew that he wanted to transfer to another facility to obtain drugs.[6]  He may be asserting, however, that there was an agreement between the Government and his Attorney that he would be transferred to Piscataquis County Jail, once he entered a guilty plea.[7]

---

[6] There was no evidence that the United States Attorney knew that Mr. Newbert was seeking a transfer to Piscataquis County Jail to obtain Methadone and Oxycodone or that she would have the authority to effect such a transfer.  Supervisory Deputy Marshal Randy Ossinger testified that, although the Marshal Service will attempt to accommodate special requests, it is the United States Marshal, not the United States Attorney, who makes the "ultimate decision where [a prisoner] is going."  *Hr'g on Mot. to Withdraw Plea Tr.* 93:14-17.

[7] It is not clear whether the Defendant is pressing this argument.  The Defendant did not raise it in his post-hearing memorandum.  *Post-Hr'g Argument in Support of Def.'s Mot. to Withdraw Guilty Plea* (Docket # 142) (*Post-Hr'g Argument*).  Nevertheless, the Court will address the possible existence of a *quid pro quo* between the parties to transfer Mr. Newbert to a different facility in exchange for the guilty plea.

Deputy Ossinger confirmed that Mr. Newbert had been incarcerated in the Penobscot County Jail before the Rule 11 hearing and was transferred to Piscataquis County Jail after the plea. *Hr'g on Mot. to Withdraw Plea Tr.* 90:21-25; 91:1-2; 92:23-25; 93:1-2. Deputy Ossinger explained that, except for a limited category of prisoners, such as those recently arrested, in transit, or awaiting transfer, the primary place to house federal prisoners is the Cumberland County Jail, which has set aside a number of beds. *Id.* at 91:5-9. Occasionally, prisoners will be housed in the Piscataquis County Jail, but this depends on whether Piscataquis has an available bed. *Id.* at 91:10-15. At some point, Deputy Ossinger received a joint request from the Assistant United States Attorney and Defense Counsel to house Mr. Newbert in the Piscataquis County Jail.[8] He contacted Piscataquis and learned that it had an available bed and was willing to take the Defendant; the Marshal Service therefore assigned Mr. Newbert to Piscataquis County. *Id*. at 91:20-25; 92:1-15; 93:1-2.

This evidence does not begin to establish that there was an agreement between the Government and Mr. Newbert to transfer him to Piscataquis County in exchange for his entering a guilty plea. The United States Attorney does not have the authority to direct the United States Marshal on where to house a prisoner and, in this circumstance, the United States Marshal did not have the authority to direct Piscataquis County Jail to accept Mr. Newbert. A discussion between counsel as to where Mr. Newbert would be housed after he pleaded guilty and an attempt to accommodate his desire to be housed in a particular jail falls far short of a promise by the Government in exchange for the entry of a guilty plea.

Furthermore, during the Rule 11 colloquy, the Court expressly asked the Defendant: "Aside from the written plea agreement, Mr. Newbert, has anyone made any promises to you in

---

[8] Mr. Newbert resides in Milo, Maine nearby the Piscataquis County Jail. If housed in Cumberland County, he would be hours away from his family and friends, an independent reason the Piscataquis County Jail would have been preferable to the Defendant.

an effort to get you to plead guilty?"  *Rule 11 Tr.* at 20:8-10.  Mr. Newbert responded:  "No."  *Id.* at 20:11.  If Mr. Newbert thought he was the beneficiary of an agreement that he be housed in a particular jail in exchange for entering a guilty plea, this question should have uncovered that agreement.  It did not.  Again, the Court is entitled to hold Mr. Newbert to his assurances. *Parrilla-Tirado*, 22 F.3d at 373.  The Court rejects the Defendant's argument that the Government's promises improperly induced his guilty plea.

The Court also rejects his assertion that he harbored an undisclosed compulsion to be transferred to the Piscataquis County Jail to obtain Methadone and Oxycodone and that this affected his decision to plead guilty.  His current assertions contradict not only his representations to the Court, but also the Court's own observations of the Defendant when he entered his guilty plea.  There is simply no evidence that he was suffering from withdrawal symptoms when he entered his guilty plea.

The Court concludes that Mr. Newbert's guilty plea on June 7, 2006 complied with each of the formal requirements of Rule 11 and that his guilty plea was knowing, intelligent and voluntary.

### B.  The Force of Defendant's Reasons for Withdrawing the Guilty Plea

The analysis starts with the nature of the Government's case.  On February 15, 2006, the Government filed a written Prosecution Version of the Offense, which set forth in detail the evidence the Government would have brought to bear had the matter proceeded to trial. *Prosecution Version* (Docket # 38).  On June 7, 2006, Mr. Newbert admitted to the facts in the Prosecution Version,[9] including:

---

[9] The Court asked "I'm going to ask you a very important question, Mr. Newbert, and obviously, I need a truthful answer.  Is there any respect with which you disagree with what is set forth in the prosecution version dated February 15, 2006?"  Mr. Newbert responded "No."  The Court continued "Is the information set forth in the prosecution version true to your own personal knowledge?"  Mr. Newbert responded "Yes."  *Rule 11 Tr.* at 13:5-13.

On February 28, 2002, law enforcement authorities executed a state search warrant at the residence of Winslow Newbert in Milo, Maine. During the course of the search the authorities recovered, among other things, 18.3 grams of a white powdery substance, digital scales and certain hand written records which the defendant acknowledged were, in fact, records related to narcotics transactions in which he had engaged. In addition, during the search, the defendant admitted to a member of the search team that some of his customers brought him personal property which they would trade to him in exchange for cocaine. Finally, a certified forensic chemist would testify that the white powdery substance recovered from the defendant's residence contained cocaine hydrochloride.

*Prosecution Version* at 1.

At the hearing on the motion to withdraw, the Government introduced the testimony of investigating officer Fred Luce. Officer Luce testified that Mr. Newbert made a proffer after his arrest. *Hr'g on Mot. to Withdraw Plea Tr.* at 159:20-23. During the proffer session, Mr. Newbert stated that he had obtained the cocaine that the police found in his home from Alan Lafountain and that he still owed Mr. Lafountain between $1,500 and $1,700 for the cocaine. *Id.* at 160:9-14. He also told Officer Luce that he had been getting approximately 6 to 7 ounces of cocaine every two to three weeks from Mr. Lafountain. *Id.* at 160:18-22. Mr. Newbert further admitted that he traded some of the cocaine for stolen property. *Id.* at 160:18-22. At no point during the proffer session did Mr. Newbert assert that the cocaine in his house belonged to anyone but himself.

In sharp contrast to his representations at the Rule 11 Hearing, Mr. Newbert now claims that the cocaine in question was not his. Mr. Newbert tells quite a tale about why he pleaded guilty to a crime he did not commit. According to Mr. Newbert, two people factored into his decision: (1) Gail Newbert, his wife; and (2) James Michael "Hippie" Smith, his best friend.

### 1.  Winslow Newbert, Gail Newbert, and James Michael Smith

Mr. Newbert testified that, on February 28, 2002, the day of the search of his home, he was attending his mother's birthday party at her house.  *Hr'g on Mot. to Withdraw Plea Tr.* 48:19-20.  While there, he received a telephone call from either Detective Flagg or Detective Pearson, informing him:  "[I]f you don't want your wife to go to jail, you want - - you want to show up here within 30 to 40 minutes.  They called me on my cell phone and said, show up within 30 to 40 minutes, or we're going to arrest your wife and take her to jail."  *Id.* at 48:17-25.  His mother drove him to his house and when he arrived, he found "all kinds of cops around."  *Id.* at 49:17-20.  He entered the house and was peppered with accusations, such as "[y]ou traded cocaine with Mack[ie] Bedard for this, for that, and we - - we know you're a major dealer, and we know you've got 500 Oxycontin here."  *Id.* at 49:21-24.  Mr. Newbert continued to deny his involvement, but "after a while, I said, whatever, whatever, whatever, whatever, because they wasn't taking no for an answer."  *Id.* at 50:7-14.

Married with three children, Gail and Winslow Newbert have been together for twenty years.  *Id.* at 24:25; 25:1-3.  Ms. Newbert testified at the hearing on the motion to withdraw and denied that the cocaine in the Newbert home was hers:  "No, it wasn't mine.  I don't use cocaine. I never have."  *Id.* at 32:5-9.  Mr. Newbert explained at the hearing on the motion to withdraw that he admitted the contents of the Prosecution Version on June 7, 2006, in part, because he "wanted to make sure my wife was all right."  *Id.* at 53:4-8.

As Mr. Newbert's best friend, James Michael Smith would go over to the Newberts' "all the time," frequently for dinner.  *Id*. at 47:15-18.  Mr. Newbert testified that Mr. Smith had helped him work on his house and payment was "done in dinners and suppers."  *Id.* at 47:13-23. Mr. Smith testified that "[Mr. Newbert] was remodeling his home, and I was there sometimes,

and I did pitch in, but it wasn't like I was there working, no." Mr. Smith further testified that he uses cocaine, that sometimes he and Mr. Newbert "got high together, but it wasn't for no kind of payment," and that Mr. Newbert would sometimes give him "a line or two" of cocaine, but that it was not for his assistance around the house. *Id.* at 111:8-9; 112:5-7, 13-19.

After the police search on February 28, 2002, Mr. Newbert learned from his wife that the cocaine the police found was likely Mr. Smith's. *Id.* at 60:10-25; 61:1-7. Even though he suspected that the cocaine was Mr. Smith's, Mr. Newbert did not tell the police because he felt an obligation to Mr. Smith, because Mr. Smith's boss had bailed him out earlier on the condition that he "keep [his] mouth shut about Mike." *Id.* at 61:22-23. Additionally, Mr. Smith himself had previously bailed Mr. Newbert out. *Id.* at 61:23-25. On this occasion, Mr. Newbert stated that he "figured that [Mr. Smith] was helping me as far as bail and everything . . . ." *Id.* at 62:11-12. As Mr. Newbert explains it, he was essentially willing to take the rap in order to protect not only his best friend, Mr. Smith, but also his wife, whom the police had threatened to arrest if he did not confess.[10] Mr. Newbert's altruism, however, had its limits.

### 2. James Michael Smith and Gail Newbert

Sometime shortly after June 7, 2006, when he entered his guilty plea, Mr. Newbert telephoned Mr. Smith at his apartment. Mr. Newbert had been surprised to learn that the Government had listed Mr. Smith as a witness against him and he was calling Mr. Smith to find out why.[11] When he called Mr. Smith's apartment, Gail Newbert answered the phone and he

---

[10] Gail Newbert offered another reason for her husband's decision to plead guilty: "Winslow had said that he didn't want to go to jail being a rat." *Hr'g on Mot. to Withdraw Plea Tr.* at 37:10-11. But, this explanation is curious, because it assumes that Mr. Newbert would end up in jail, even after he revealed the true culprit.

[11] The timing is confusing. The Government filed a witness list on March 28, 2006, which did not contain Mr. Smith's name, *Gov't Am. Witness List* (Docket # 54); on May 30, 2006, the Government filed another witness list that did contain Mr. Smith's name, *Gov't Am. Witness List* (Docket # 95). The telephone conversation, therefore, took place after May 30, 2006. It would be surprising if Mr. Newbert had not discussed Mr. Smith's appearance as a Government witness with his Attorney before he entered the guilty plea on June 7, 2006, since it would affect the strength of the Government's case. But, there is no evidence that he did. During his testimony, Mr. Newbert

discovered the disheartening news that Mr. Smith had "proferred with the Government against [him]." *Id.* at 56:13-16. He asked her to put Mr. Smith on the phone, but she refused. *Id.* at 56:16-17.

That telephone conversation was depressing to Mr. Newbert on a number of levels. Earlier, he had testified that, after the search of his home, he and his wife had continued to live together until April 21, 2006, when Mr. Newbert was arrested and his bail was revoked. He stated that they had a "good relationship up until he was incarcerated."[12] *Id.* at 23:21-23. After this phone conversation, however, Mr. Newbert described his state of mind as "my wife was living with somebody that was telling lies against me, and my state of mind was I was just giving up. My wife's gone . . . it's a lot to think about. It didn't help me . . . ." *Id.* at 56:21:25; 57:1-2. He explained his initial confessions in his own proffer session as "Basically I was trying to protect my wife and my – my best friend, supposedly . . . . I probably - - I said I could do things because I figured I was protecting them . . . ." *Id.* at 72:22-25; 73:1-5. Notwithstanding this somber news, and despite the fact that Mr. Newbert had recently pleaded guilty, Mr. Newbert seemed to accept his fate and did not move immediately to withdraw his guilty plea.

### 3.  The Testimony of Gail, Miranda and Desiree Newbert

Gail Newbert testified at the hearing on Mr. Newbert's motion to withdraw his guilty plea. She said that before the February 28, 2002 search, she was aware that Mr. Smith was using cocaine "a lot" and that Mr. Smith had used their cellar to stash it. *Id.* at 26:3-10. She said that on one occasion he had put cocaine on the side of the stairway leading to the basement and on

---

insisted he did not learn about Mr. Smith's proffer until after he entered his plea. *Hr'g on Mot. to Withdraw Plea Tr.* at 64:6-12. If the conversation with Mr. Smith took place before Mr. Newbert entered his plea, his decision to plead guilty would be inexplicable. It is unlikely Mr. Newbert would take the fall as an act of loyalty to a friend who was willing to testify against him.

[12] After Mr. Newbert was incarcerated, Ms. Newbert moved in with James Michael Smith. *Hr'g on Mot. to Withdraw Plea Tr.* at 34:21-25; 35:1. She explained that she stayed with Mr. Smith for "a few weeks" because she has respiratory problems and could not live with Mr. Newbert's mother. *Id.* at 34:21-25; 35:1.

another, he had hidden it "like around by where the washer/dryer was." *Id.* at 26:15:19.  The last time she had seen Mr. Smith put cocaine in their basement was only "[l]ike one or two days before" the search.  *Id.* at 26:20-23.  She testified that Mr. Smith "had cocaine on him that day" and had put it "on the shelf;" she told him to "take care of it, take it out of there . . . ." *Id.* at 27:3-6.  She was unaware whether he did so.  *Id.* at 27:7-12.

Two of the Newberts' children also testified:  Miranda and Desiree.  Miranda is fifteen; in 2002 at the time of the search, she was eleven.  *Id.* at 10:14-17.  Miranda said that about one week before the search, she "observed [James Michael Smith] in the basement [of their home] with an orange pill bottle, and he caught me and he threatened me not to tell anyone." *Id.* at 12:2-9.  She said she saw Mr. Smith "put a pill bottle on the side . . . of the stairs going down [to the basement]." *Id.* at 12:18-24.  Although she told her grandmother about her encounter with Mr. Smith, she did not tell anyone else until the summer of 2006, when she told her father who was in the Piscataquis County Jail.[13]  *Id.* at 13:12-22.

Desiree Newbert, who is eighteen, also testified at the hearing.[14]  She stated that when her mother and Mr. Smith were living together in the spring of 2006, they invited her and her boyfriend, Andrew Desrochers over to watch a movie and have pizza.  *Id.* at 123:22-25; 124:1-4.  When Desiree and Andrew first arrived, Desiree witnessed Mr. Smith receive a packet of something, which Desiree assumed was cocaine because it was a white substance.  *Id.* at 124:15-25.  After a time, Andrew had left to get some cigarettes and Gail Newbert was talking on the

---

[13] Miranda's testimony is extremely confusing as to when she told her father about Mr. Smith and the pill bottle. She testified on direct examination that she told him at the Piscataquis County Jail, but on cross-examination, she insisted she told him when he was at the Penobscot County Jail, not at the Piscataquis County Jail.  *Hr'g on Mot. to Withdraw Plea Tr.* at 13:19-22; 18:16-18.  But, on redirect examination, she recalled that she had completed an affidavit about one week after she informed her father and, along with the motion to withdraw guilty plea, Defense Counsel filed an affidavit signed by Miranda on July 28, 2006.  *Mot. to Withdraw Plea of Guilty*, Ex. 1.  If Miranda had told him at the Penobscot County Jail, this likely would have been before he entered the guilty plea and would not provide a basis for withdrawing the plea.

[14] Desiree was present at the original hearing on October 18, 2006, and it was at the close of that hearing that she first revealed Mr. Smith's confession to Mr. Newbert's attorney.

phone to Mr. Newbert, who had called to talk to Mr. Smith; this left Desiree and Mr. Smith alone in a room in the apartment. *Id.* at 125:14-17; 126:13-15. Desiree testified that the phone call from Mr. Newbert prompted Mr. Smith to make some nasty remarks about her father, including poking fun at his ponytail and saying that his favorite color must now be orange, a reference to his prison clothing. *Id.* at 126:13-25; 127:1. He then essentially confessed to the crime to which her father had pleaded guilty. *Id.* at 125:14-25; 126:1. She testified: "I do remember him saying that it was his cocaine - - that people like me are out on the street doing this still while people like your father are in jail and they didn't even do it." *Id.* at 125:19-25; 126:1. Desiree testified that Mr. Smith admitted to her that "that was my cocaine." *Id.* at 127:9-14.

After Desiree heard Mr. Smith's comment, she began "crying hysterically" and she left the apartment. *Id.* at 127:20-22. Her boyfriend, Andrew, returned to find Desiree sitting downstairs in a hallway outside the apartment, "crying hysterically" and "kind of ready to flip out." *Id.* at 138:13-17. Desiree told Andrew that Mr. Smith was "rubbing it in her face because of something her dad wasn't supposed to be in, and he should have, and he wasn't." *Id.* at 141:2-6.

### 4. The Testimony of James Michael Smith

Again, when Mr. Smith testified at the hearing, he admitted that he has used cocaine and that he and Mr. Newbert would get "high together." *Id.* at 111:8-9; 112:13-15. He further acknowledged that after he worked on Mr. Newbert's home, Mr. Newbert would occasionally give him "a line or two," but it was not as payment for the work. *Id.* at 112:3-19. Mr. Smith emphatically denied that he was the source of the cocaine at the Newbert home in February 2002. *Id.* at 115:18-25; 116:1-6. He also denied that he had ever "planted" any cocaine in the Newbert house or that he had ever left a prescription pill bottle on the stairway to the basement.

*Id.* at 115:18-25; 126:1-6.  He denied that he ever told Desiree Newbert that it was his cocaine found at the Newbert home or, for that matter, that he ever discussed cocaine or Mr. Newbert's arrest with Desiree.  *Id.* at 110:14-25; 111:1-4.

### 5.  Handwritten Records and Mackie Bedard

In addition to his assertion that he pleaded guilty to protect his wife and best friend, Mr. Newbert responded to two other matters.  First, although he categorically denied ever selling cocaine, *id.* at 50:15-16, Mr. Newbert explained that the handwritten records that the officers found in his house reflected purchases that he made of Oxycontin.  *Id.* at 52:11-22.  He readily admitted that he "did do a few Oxycontin back then" and he did not deny "that I ever was an addict or I used the pill."  *Id.* at 52:11-19.  But, he denied the records were for cocaine.  *Id.* at 52:11-22.

Second, he responded to evidence about Maurice "Mackie" Bedard.  Officer Luce testified that during an interview with Gail Newbert, she had told him that Mr. Newbert had given Mackie Bedard cocaine in exchange for stolen property.[15]  *Id.* at 163:5-15.  Mr. Newbert acknowledged that he "was buying from Mack[ie] and selling for him."  *Id.* at 51:3-7.  But, he denied ever purchasing stolen property from Mr. Bedard with cocaine.  *Id.* at 51:8-10.

### 6.  Discussion

There is no doubt that when the police searched Mr. Newbert's residence on February 28, 2002, they found cocaine.  Apart from the cocaine being in his home, however, there is no direct physical evidence linking Mr. Newbert to the cocaine.  For example, the Government's attempt to lift fingerprints from the plastic baggy containing the cocaine was unsuccessful.  *Id.* at 178:12-25; 179:1-25; 180:1-2.  Nor is there any eye witness testimony from a law enforcement officer or

---

[15] When she testified, Gail Newbert stated she could not recall ever telling Officer Luce that her husband had given Mr. Bedard cocaine in exchange for stolen property, but she admitted telling him that her husband had received stolen property from Mr. Bedard.  *Hr'g on Mot. to Withdraw Plea Tr.*  at 34:5-9.

other witness establishing that Mr. Newbert possessed this cocaine and there is no evidence from the individual who was the source of the cocaine.  As the cocaine was in the Newbert home, the evidence points to three people who may have been the source:  Gail Newbert, James Michael Smith, and Winslow Newbert.[16]  Gail Newbert denied having anything to do with the cocaine and there is no suggestion she was involved.  This leaves the likely source as either Mr. Smith or the Defendant.

To prove its case, the Government intended to rely on the testimony of Mr. Smith, who denied that he was the source of the cocaine, and who further testified that, in the past, Mr. Newbert had been a source of cocaine for him.  There is no indication, however, that Mr. Smith would have linked Mr. Newbert to the specific cocaine found in his home on February 28, 2002. For this crucial link, the Government likely would introduce Mr. Newbert's own prior statements, admitting that the cocaine was his and providing information about where he got the cocaine and what he did with it.

Against this evidence, Mr. Newbert proposes to present evidence that his wife saw Mr. Smith stash cocaine in the Newbert basement one or two days before the search and that she told Mr. Smith to get rid of it.  Generally consistent with her testimony is the testimony of Miranda Newbert, who saw Mr. Smith hide a prescription bottle on the side of the stairway leading to the basement of the Newbert house a few days before the search.  Based on this testimony, it is at least plausible that Mr. Smith was using the Newbert home to hide his drugs.  More significantly, Desiree Newbert testified that, after Mr. Newbert was incarcerated, Mr. Smith admitted that the cocaine found in the Newbert home was his.  Absent Mr. Newbert's admissions, the trial would be a swearing contest between the Newbert women and Mr. Smith.  But, Mr. Newbert admitted the cocaine was his.

---

[16] There is no suggestion that the Newbert children were the source of the illegal drugs.

This leaves the puzzling question as to why Mr. Newbert would confess to a crime he did not commit.  It is not inconceivable that a husband would be willing to go to jail for his wife.  Here, Mr. Newbert maintains that he confessed to the crime only after the police had threatened to arrest her.  It is also not beyond imagination that a person would go to jail for a friend.  Similarly, Mr. Newbert maintains that he was motivated to plead guilty, in part, to protect his best friend.

But, what does strain the imagination is the notion that Mr. Smith, knowing that he was the true culprit and that Mr. Newbert was making an extraordinary sacrifice for him, would return this exceptional act of friendship by allowing Gail Newbert to move in with him, within a few weeks, if not days, of Mr. Newbert's incarceration.  The same, of course, is true of Gail Newbert, who, with full reason to believe that her husband is undertaking a supremely selfless act, repays him by moving in with the real criminal.  It is true that there is no direct evidence that Mr. Smith and Ms. Newbert were romantically involved, but it is beside the point, since Mr. Newbert thought they were.[17]

Further, the significance of Miranda's information concerning Mr. Smith and the prescription bottle is murky.  In his motion for withdrawal, he asserted that "newly discovered evidence suggests that [Mr.] Smith, a family friend, placed a pill bottle in Newbert's basement

---

[17] Neither Gail Newbert nor Mr. Smith was directly asked about the nature of their relationship.  Gail Newbert explained why she could not live with her mother-in-law, but never explained why she could not have continued to live in the Newbert home after her husband was incarcerated.

Mr. Newbert's testimony leaves the strong impression that he thought they were having an affair.  He said that his relationship with Gail Newbert was "[n]ot very good . . . I'm incarcerated.  She was living with Mike Smith when Detective Luce talked to her . . . So, no, not very good - - not a very good relationship right now, no." *Hr'g on Mot. to Withdraw Plea Tr.* at 45:18-25.  He described his state of mind: "State of mind?  The state of mind was my wife was living with somebody that was telling lies against me, and my state of mind was I was just giving up.  My wife's gone." *Id.* at 56:21-25.

Desiree Newbert was asked about her parents' marriage and the relationship between her mother and Mr. Smith and she agreed that her parents were having problems with their marriage.  *Hr'g on Mot. to Withdraw Plea Tr.* at 130:25; 131:1-6.  When asked whether Mr. Smith and her mother were having a romantic relationship, she replied:  "I - - I have no idea.  I hope not, but I - - I don't know." *Id.* 131:7-9.  Later, she testified that she "wasn't very happy with my mom for even being [at Mr. Smith's]." *Id.* 131:10-13.

shortly before his arrest." *Def.'s Mot.* at 2. He maintains that Miranda – and later Desiree – provided him with "additional information regarding the actual source of the seized cocaine." *Post Hr'g Argument* at 2. Yet, during his testimony, he admitted that, shortly after the search of his house, he discussed this very issue with Gail Newbert and she told him then that she thought the cocaine might have been Mr. Smith's.[18]  *Id.* at 60:10-25; 61:1-7. Moreover, Miranda's information that Mr. Smith placed an orange prescription bottle on the basement stairway does not relate to the presence of cocaine. There is no evidence that the police found a prescription bottle on the side of the cellar stairway, much less one that contained cocaine. *Id.* at 159:8-19.

More logically, Mr. Newbert's decision to seek to withdraw his guilty plea is the culmination of a number of factors. When he was arrested and jailed, he discussed the potential range of sentence and entered into a plea agreement on the assumption that the likely sentence would be somewhere between 6 and 30 months, and most likely between 15 and 21 months. Following his guilty plea, he learned a number of important facts. First, his wife was living with his best friend, arousing the suspicion that they were not nearly as loyal to him as he was to them. Second, Mr. Smith may have stashed other drugs in Mr. Newbert's house, making it more likely that Mr. Smith was the source of the cocaine. Third, the potential range of sentence was not between 15 and 21 months, but between 210 and 240 months.

Although not pressed as a reason for the withdrawal of plea, the marked change in the likely sentence is not an insignificant consideration in evaluating the merits of the motion to withdraw. It is true that, at the Rule 11 hearing, Mr. Newbert was warned that, by pleading guilty to the crime, he was subject to "a period of imprisonment not to exceed 20 years." *Rule 11 Tr.* at 8:14-15. Realistically, however, once the lawyers placed offense level 10 in the appeal

---

[18] It could be that Miranda's new information reminded Mr. Newbert of his wife's earlier suspicions about Mr. Smith or that the information about the prescription bottle yielded cumulative information about Mr. Smith's involvement, but Mr. Newbert never testified about either of these possibilities.

provision of the plea agreement, a sentence within that range would have been a reasonable estimate of the probable outcome. If a defendant has been properly informed at the Rule 11 of the maximum penalty, a dramatic difference between the plea agreement and the PSR's projection of the sentencing range does not justify withdrawal of a plea. But, in the context of this case, if Mr. Newbert's explanation for why he pleaded guilty is accepted, the escalated sentence would have placed an intense strain on Mr. Newbert's willingness to continue to take responsibility for his former friend. A person might be willing to spend a couple of years in prison for a crime someone else committed, but only a person of rare courage and altruism would be willing to spend between seventeen and a half to twenty years in jail for someone else's crime.

### C.  The Timing of Mr. Newbert's Motion

Mr. Newbert entered a guilty plea on June 7, 2006, and filed a motion to withdraw his plea on July 31, 2006. The First Circuit has noted that a "long interval between the plea and the request often weakens any claim that the plea was entered in confusion or under false pretenses." *United States v. Gonzalez*, 202 F.3d 20, 24 (1st Cir. 2000) (quoting *United States v. Doyle*, 981 F.2d 591, 595 (1st Cir. 1992)); *see also United States v. Isom*, 85 F.3d 831, 838-39 (1st Cir. 1996). The "longer a defendant waits before moving to withdraw his plea, the more potency his motion must have in order to gain favorable consideration." *United States v. Gonzalez-Vazquez*, 34 F.3d 19, 23 (1st Cir. 1994) (quoting *Parrilla-Tirado*, 22 F.3d at 373)). Here, the time period between the guilty plea and the filing of the motion was just under seven weeks.

Under First Circuit authority, however, the "relevant temporal gap" is not necessarily between the Rule 11 and the filing of the motion to withdraw, but rather between the defendant's "discovery of the new information and the filing of his motion." *Gonzalez*, 202 F.3d at 24. The

First Circuit has upheld the rejection of plea withdrawal motions in which the relevant gap ranged from eight months, *id.*, to thirteen days. *United States v. Ramos*, 810 F.2d 308, 313 (1st Cir. 1987).[19]  The "new information" the Defendant points to is Miranda's late July, 2006 story to her father that she "observed [Mr. Smith] down in the basement with an orange pill bottle, and he caught me and he threatened me not to tell anyone." *Hr'g on Mot. to Withdraw Plea Tr.* at 12:4-7.

Because the Court is uncertain whether Miranda's information constituted "new information," determining whether the relevant temporal gap in this case should commence on June 7, 2006 – the date of the plea – or late July, 2006 – the date of Miranda's meeting with her father – is problematic.  Mr. Newbert says that he filed the motion to withdraw shortly after learning Miranda's information, but, as discussed earlier, Mr. Newbert had long known from his wife that the cocaine may have belonged to Mr. Smith.  Furthermore, during the search, the police did not find a prescription bottle on the side of the basement stairway.  It remains unclear why Mr. Newbert thought Miranda's information was so significant that it led him to move to withdraw his guilty plea.

The Court does not need to resolve this perplexing issue.  In either case, whether the gap is seven weeks or a few days, the delay in filing was not excessive and does not weigh heavily against granting the motion.

### D.  Assertion of Actual Innocence

---

[19] In *United States v. Leland*, this Court rejected a motion for withdrawal of guilty plea, where the gap was "nearly a year after his plea was accepted and eights months after the Presentence Report was completed."  370 F. Supp. 2d 337, 345 (D. Me. 2005), *aff'd*, No. 05-2670, 2006 U.S. App. LEXIS 24085 (1st Cir. Sept. 22, 2006).

Mr. Newbert asserts that he is actually innocent of this crime. Mr. Newbert has maintained this position since he filed his motion.[20] This is a most serious factor. The First Circuit has stated that courts "look more hospitably on a motion to withdraw a guilty plea when the motion is coupled with an assertion of innocence." *Doyle*, 981 F.2d at 596. The unseemly prospect of imposing a lengthy federal sentence on a man who, despite having admitted to the crime, now proclaims his innocence weighs in favor of granting the motion.

### E. Plea Agreement

Mr. Newbert and the Government entered into a written plea agreement.[21] The plea agreement described in detail the charge to which Mr. Newbert was pleading, the maximum term of imprisonment, and other potential penalties. It specified that, if the Court rejected the recommendations of the parties regarding sentence, Mr. Newbert would "not thereby be permitted to withdraw his plea of guilty." *Plea Agreement* at 3 (Docket # 109). The plea agreement contains the signatures of the Government's attorney as well as those of the Defendant and his attorney.[22] *Id.* at 4-5. Under *Gonzalez*, a signed agreement "casts further doubt on [a defendant's] claims." *Gonzalez*, 202 F.3d at 24.

In *United States v. Ramirez-Benitez*, the First Circuit reviewed the contents of the plea agreement in tandem with the Court's inquiry at the Rule 11. 292 F.3d 22, 28 (1st Cir. 2002). During the Rule 11, Mr. Newbert confirmed the Defendant's signature was his, he had signed the agreement voluntarily, he had read the agreement before he signed it, he understood all its

---

[20] By contrast, in *Leland*, the defendant did not directly assert his innocence until the middle of an oral argument on the motion to withdraw and only after the Court had discussed the potential significance of the defendant's assertion of innocence. *Leland*, 370 F. Supp. 2d at 346.

[21] This plea agreement was not a package plea and does not raise the same voluntariness concerns the First Circuit discussed in *United States v. Mescual-Cruz*, 387 F.3d 1, 7 (1st Cir. 2004).

[22] Mr. Newbert makes no claim that the Government has breached the agreement. *Compare with United States v. Tilley*, 964 F.2d 66, 69-71 (1st Cir. 1992). Nor does Mr. Newbert make any claim that there was a conflict of interest between him and his defense counsel, for Sixth Amendment purposes. *Compare with United States v. Segarra-Rivera*, No. 05-1582, 2007 U.S. App. LEXIS 542, *9-13 (1st Cir. Jan. 11, 2007).

contents before he signed it, and in signing it, he intended to agree to all its terms and conditions. *Rule 11 Tr.* at 14:6-21. The Court reviewed in detail the recommendation provisions of the agreement and the appeal provisions. *Id.* at 14:6-25; 15:1-25; 16:1-25; 17:1-25; 18:1-25; 19:1-5. Consistent with *Gonzalez*, the Court concludes that this plea agreement "casts further doubt" on the merits of Mr. Newbert's motion.

### F. Prejudice to the Government

Before allowing a defendant to withdraw his plea the court must also "consider the potential prejudice to the government." *Richardson*, 225 F.3d at 51; *Marrero-Rivera*, 124 F.3d at 347. The Government flatly asserts that, if it were required to try the case now, it would be prejudiced. *Govt.'s Post Hr'g Argument Regarding the Def.'s Mot. to Withdraw Guilty Plea* at 7 (Docket # 143). It argues that "memories have faded." *Id.* But, the relevant time period is the time from when the case would have gone to trial, but for the guilty plea – June, 2006 – to today. There is no evidence of any prejudice from this delay. The search in this case took place on February 28, 2002, and the Government waited until July 12, 2005 to indict Mr. Newbert. Trial was set for late spring 2006, when Mr. Newbert pleaded guilty and, with the exception of Mr. Smith, the Government's listed witnesses were law enforcement officers and a chemical expert. *Govt.'s Second Am. Witness List*. There is no suggestion that critical witnesses are unavailable, that evidence has been lost, or that any similar prejudice would obtain. Further, the evidence at the motion hearing suggests otherwise.

## III. CONCLUSION

The Defendant's motion to withdraw his guilty plea presents the Court with a difficult decision. There are compelling judicial policies favoring the finality of court actions and discouraging litigants from making misrepresentations to the courts. In June, Mr. Newbert stood

in open court, admitted his guilt, affirmed in detail what he had done, acknowledged the potential punishment and, after a thorough colloquy with the Court, pleaded guilty. Based on his representations, the Court formally accepted his guilty plea. By July, he wished to undo what he had done. He announced his total innocence, and sought a trial.

To allow a defendant to withdraw a guilty plea before the imposition of sentence, the Court must be satisfied that there is a "fair and just reason" for doing so. Fed. R. Crim. P. 11(d)(2)(B). This case is very close. The Court firmly rejects the Defendant's attacks on the Rule 11 hearing; the Court has no doubt that the Defendant was competent to enter a plea and that he did so knowingly, intelligently, and voluntarily. This is buttressed by a detailed, signed agreement to plead guilty. This combination of circumstances would amply justify denial of the motion to withdraw.

However, the Defendant presented the sworn testimony of witnesses, other than himself, that another individual is not only guilty of the crime, but has admitted his guilt. He proffered a facially plausible explanation for his guilty plea; he moved to withdraw before his sentencing and within two months of the guilty plea; and, there is no evidence that the Government would be prejudiced by the withdrawal. Ultimately, because a man's reputation and freedom hang in the balance, the Court concludes that the better course is to allow a jury to determine whether he is guilty – as he admitted he was - or not guilty – as he now insists he is. The Court GRANTS Defendant's Motion to Withdraw Guilty Plea (Docket # 115).

      SO ORDERED.

                                  /s/ John A. Woodcock, Jr.
                                  JOHN A. WOODCOCK, JR.
                                  UNITED STATES DISTRICT JUDGE

Dated this 17th day of January, 2007